Clifford **LOVELACE**

v.

Raymond **LOPES.**

Civ. No. H–84–735 (TEC).

United States District Court, D. Connecticut.

March 18, 1986.

Jon C. Blue, Asst. Public Defender, Office of the Chief Public Defender, New Haven, Conn., for petitioner.

John Massameno, Asst. State's Atty. Office of the Chief State's Attorney, Wallingford, Conn., C. Robert Satti, State's Atty. for the Judicial Dist. of New London, New London, Conn., for respondent.

## RULING ON APPEAL FROM THE JUDGMENT OF THE MAGISTRATE

CLARIE, Senior District Judge.

Clifford Lovelace is an inmate at the Connecticut Correctional Institution at Somers, Connecticut. He petitioned this federal court for a writ of habeas corpus on March 30, 1984, complaining that his state court conviction and confinement were illegal. He represents that his conviction of the crime of murder, Connecticut General Statutes Sec. 53a–54a was obtained in violation of his federal constitutional rights. The Court referred the matter to United States Magistrate F. Owen Eagan for a hearing, and the parties agreed that it could be heard for all purposes. By ruling dated July 15, 1985, Magistrate Eagan held that "[t]he trial court's order of a mid-trial psychiatric examination of the petitioner denied the petitioner his right to due process of law, in violation of the fifth and fourteenth amendments." Pursuant to this finding, the Magistrate granted the petition, but stayed execution of judgment pending an appeal and review by this Court.

After studying the trial transcript and the entire record of the proceedings before the Magistrate the Court sustains the Magistrate's finding that the petitioner's privilege against self-incrimination was not violated. However, the Court overrules the Magistrate's finding that the trial court's order for the mid-trial psychiatric examination deprived the petitioner of a fundamentally fair trial. Therefore, the judgment of the Magistrate is reversed and the petition for a writ of habeas corpus is denied.

### I. Facts

#### A. Procedural History

The petitioner was found guilty by a jury of the crime of murder, Conn.Gen.Stat.

§ 53a–54a, in Connecticut Superior Court for the Judicial District of New London on March 19, 1981. On June 22, 1981, he was sentenced to a term of imprisonment of eighteen years to life, which term he is currently serving at the Connecticut Correctional Institution, at Somers. The conviction was affirmed on appeal by the Connecticut Supreme Court on December 13, 1983. *State v. Lovelace,* 191 Conn. 545, 469 A.2d 391 (1983). The United States Supreme Court denied the petition for writ of certiorari on March 19, 1984. *Lovelace v. Connecticut,* 465 U.S. 1107, 104 S.Ct. 1613, 80 L.Ed.2d 142 (1984).

On March 30, 1984, pursuant to 28 U.S.C. § 2254, Clifford Lovelace filed a petition for a writ of habeas corpus with this Court. Under the provisions of 28 U.S.C. § 636(c) and Rule 4(A)(1) of this District's Local Rules for United States Magistrates, the parties agreed to proceed to a hearing and judgment before United States Magistrate F. Owen Eagan; however, any appeal by either party would be reviewed in this Court. *See* Rule 4(A)(2), Local Rules for United States Magistrates. An evidentiary hearing was held before the Magistrate on April 9, 1985. The Magistrate rendered a "Recommended Decision" on July 15, 1985, in which he found that the petitioner's right to due process of law had been violated by the trial court's decision to grant the state's motion to compel the defendant to submit to an additional psychiatric examination during trial. In light of this finding, the Magistrate granted the petition and ordered that the writ issue. Judgment was entered on July 19, 1985. The Magistrate stayed execution of the judgment pending appeal to this Court. *See* Rule 4(B)(3), Local Rules for United States Magistrates. The State filed a timely notice of appeal, the parties filed briefs, and the Court heard oral argument of counsel on January 21, 1986.

## B. *The Petitioner's Trial*

The trial of Clifford Lovelace began on April 29, 1981. The state presented evidence of three confessions of the petitioner. He admitted in those confessions that on April 4, 1980 he shot and killed his wife, Linda Sue Lovelace, in their home. Indeed, the petitioner concedes that "the only real issue at the trial was his mental state at the time of the homicide."

The confessions and the testimony of witnesses who had seen Mr. Lovelace before and after the shooting revealed that the petitioner was distraught because his wife had told him that she had been unfaithful to him. The confessions also described the events of the fateful morning of April 4, 1980. It was then that the victim returned from her mother's home to get some clothes. The couple argued about the victim's infidelity. The petitioner sought to discover the identity of his rival. He then shot his wife twice, first in the leg and then in the chest, with a 12-gauge shotgun at close range.

The petitioner began presentation of his defense on the afternoon of May 5, 1981. Counsel focused on the issue of the petitioner's mental state, at the time of the incident. He called two psychiatrists in support of his claim that he had acted under the influence of an extreme emotional disturbance. This defense, if proved, could serve to mitigate his liability for murder to the lesser crime of manslaughter. *See State v. Elliot,* 177 Conn. 1, 411 A.2d 3 (1979).

The nature of the pretrial psychiatric examinations and discovery conducted in the case are important elements of the petitioner's claim. Dr. Hans Langhammer was the first psychiatrist to examine the petitioner. Dr. Langhammer, at the request of the public defender, performed the first of his two examinations of Mr. Lovelace on April 8, 1980—four days after the homicide. On June 6, 1980, the State of Connecticut moved, pursuant to § 760 of the Connecticut Practice Book, for a psychiatric examination of the petitioner. The motion was granted and Dr. Robert Miller was appointed by the trial court for this purpose. Dr. Miller's attempt to examine Mr. Lovelace was frustrated, however, because the petitioner was under the impression that he

was not required to discuss the case with the court appointed psychiatrist.

The court on August 19, 1980, granted the state's "Motion for Further Order Re: Psychiatric Examination." Since Dr. Miller felt that he was not "in a position to complete the examination," in light of the initial unsuccessful attempt, the court appointed Dr. Alexander Parthenis. This examination took place on September 9, 1980. Pursuant to Connecticut Practice Book §§ 758–759, the defendant filed notice of his intent to introduce expert testimony at trial concerning his mental state at the time of the crime.

Dr. Langhammer testified so as to support his conclusion that the petitioner had acted under the influence of an extreme emotional disturbance. Dr. Parthenis testified that he had reached the same conclusion. The defense rested on May 6, 1981.

The state had planned to call Dr. Miller as an expert witness to testify in response to hypotheticals.[1] Dr. Miller was ill, however, and trial was recessed until Tuesday, May 12, 1981. When it became clear that Dr. Miller's illness was serious and he would be unavailable, the state moved for another psychiatric examination. Over the petitioner's objections, the motion was granted on May 12 and Dr. James Alexander was appointed to examine the petitioner. The examination took place on May 13 and Dr. Alexander testified on Friday, May 15. Dr. Alexander testified that although the petitioner suffered from an emotional disturbance at the time of the homicide, he could not characterize it as "extreme."

The case went to the jury on May 19, 1981 and the jury found the defendant guilty of murder.

### C. *Appeal to the Connecticut Supreme Court*

The petitioner raised "a single claim in three parts" before the Connecticut Supreme Court. *State v. Lovelace*, 191 Conn. 545, 548, 469 A.2d 391 (1983). First, he argued that "[t]he trial court's order compelling the defendant to submit to a second psychiatric examination was not permitted by the Practice Book." He also raised two constitutional claims. He argued that the trial court's order violated the petitioner's Fifth and Fourteenth Amendment right not to incriminate himself and that it violated his Fourteenth Amendment right to due process of law.

The State's Supreme court, in a unanimous decision, rejected all three arguments. As to the claimed violation of the Connecticut Practice Book, the Supreme Court held that "[t]he inability of an expert witness to testify due to illness is sufficient 'good cause' to permit the court to exercise its discretion in favor of ordering an additional psychiatric examination during the trial." *Id.* at 550, 469 A.2d 391. The question of state law is not now before the Court.

More pertinent to the instant petition for a writ of habeas corpus are the two constitutional issues ruled upon by the Connecticut Supreme Court. As to the petitioner's claimed denial of his privilege against self-incrimination, the Connecticut Supreme Court noted that once the petitioner raised the issue of his mental state he "expose[d] his mental processes to reasonable examination by the state." *Id.* at 552, 469 A.2d 391. The court rejected the petitioner's claim that, despite the initial waiver, his privilege was renewed after the state's first examination. *Id.* at 550–51, 469 A.2d 391. Instead, the court held that the propriety of an additional examination would be governed "by the exercise of judicial discretion and the requirements of due process." *Id.* at 552, 469 A.2d 391.

As to the claimed due process violation, the Connecticut Supreme Court initially noted that such claims necessarily must be decided on a case by case basis. *Id.* Characterizing the petitioner's "objection as one of timing," the court concluded that the trial court's order authorizing the midtrial examination did not "unconstitutionally

---

**1.** This fact was disputed for the first time at this stage of the proceedings. For the reasons stated *infra*, at 309–310, it is unnecessary to consider disturbing the Magistrate's finding of fact.

tip" the "balance of forces between the accused and his accuser." *Id.* at 552–53, 469 A.2d 391, *quoting Wardius v. Oregon,* 412 U.S. 470, 474, 93 S.Ct. 2208, 2212, 37 L.Ed.2d 82 (1973). The court reasoned that "[a]t some point, ordering repeated examinations will deprive a defendant of a fair trial," and that a trial court should, before ordering such an examination, consider as relevant factors "the potential for harassment, the invasiveness of the examination and unfair surprise." 191 Conn. at 553, 469 A.2d 391. Under the facts of the petitioner's case, specifically the absence of a claim of harassment or undue burden and the "emergency created by Dr. Miller's unforeseen illness," the Connecticut Supreme Court held that the petitioner had not been denied a fair trial. *Id.* at 554, 469 A.2d 391.

## II. Proceedings Before the United States Magistrate

The Magistrate held an evidentiary hearing on April 9, 1985 and rendered his decision on July 15, 1985. The petitioner raised before the Magistrate the two constitutional claims that had been rejected by the Connecticut Supreme Court.

As to the claimed infringement of the petitioner's privilege against self-incrimination, the Magistrate concluded that "multiple examinations are not prohibited." Citing *Estelle v. Smith,* 451 U.S. 454, 465, 101 S.Ct. 1866, 1874, 68 L.Ed.2d 359 (1981), the Magistrate noted that "it would be unfair to permit the defendant to introduce an issue into the case but, by his silence, to prevent the government from gathering evidence on the issue from the best, perhaps only, source." The Magistrate did not find any support for the petitioner's claim that the state should be limited to one examination, but found that the "prosecution is entitled to a fair opportunity to obtain evidence on the issue."

On the due process question, the Magistrate found that "the illness of a non-examining psychiatric expert [did not] necessitate [] a mid-trial psychiatric examination of the petitioner." Specifically, the Magis-

trate held that the trial court "undermined the purpose of the disclosure rules" and "gave a positive advantage to the State." He concluded that the trial court's order was "fundamentally unfair." Once the Magistrate found what he believed to be an error of constitutional dimensions, he determined that the error was not harmless under *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

## III. Standard of Review

Under 28 U.S.C. § 636(c)(4) and Rule 4(B)(2) of the Local Rules for United States Magistrates, the instant matter is before this Court in the form of an appeal. "The district court may affirm, reverse, modify, or remand the magistrate's judgment." 28 U.S.C. § 636(c)(4). Moreover, "[t]he scope of an appeal to the referring Judge shall be the same as on appeal from a judgment of this Court to the Court of Appeals." Rule 4(B)(2) of the Local Rules for United States Magistrates. Hence pursuant to Fed.R. Civ.P. 52(a) "[f]indings of fact shall not be set aside unless clearly erroneous."

## IV. Discussion of Law

On appeal from the judgment of the United States Magistrate, the respondent-appellant (hereinafter respondent), the State of Connecticut, urges two closely related grounds for reversal. First, the respondent urges the Court to "correct the factual inaccuracy that has plagued this case from the outset." The respondent argues that the Connecticut Supreme Court and the United States Magistrate "analyzed the petititioner's claim under an inaccurate representation of the underlying facts." Specifically, this claim involves characterizing the testimony that would have been offered at trial by Dr. Robert Miller. The State argues that Miller's initial attempt to interview Mr. Lovelace was not entirely unsuccessful and provided him with sufficient information about Mr. Lovelace's personal history and background that Miller's testimony could not fairly be characterized as being based entirely on hypothetical questions. Since this Court

disposes of this appeal in the respondent's favor "even without correction of the record," it is unnecessary to pass on the propriety of such a correction at this late stage in the proceedings. The Court notes, however, not only that the State Supreme Court's factual findings are entitled to substantial deference, 28 U.S.C. § 2254(d), but also that the Magistrate's findings of fact cannot be disturbed unless "clearly erroneous." Fed.R.Civ.P. 52(a).

The respondent's second, and persuasive, claim is that the trial court's order did not deprive the petitioner of a fundamentally fair trial. Although the Magistrate found that the petitioner's due process rights had been violated and that the order had rendered the petitioner's trial "fundamentally unfair," the Magistrate did not clearly outline the standard by which claims such as the petitioner's must be judged. Only when the stringency of that standard is fully borne in mind does it become apparent that, whatever might be said about the propriety of the trial court's order, it was not an error of constitutional dimensions depriving the defendant of his right to a fundamentally fair trial.

A federal court, in reviewing a habeas petitioner's claim that his state court conviction was obtained in violation of his federal constitutional rights, has a narrowly circumscribed role. It is not the province of the federal court to overturn a state court conviction if the petitioner's trial was imperfect or even if the trial court committed an error or an abuse of discretion. The habeas court's limited role is to determine whether the proceedings in the state court contravened the petitioner's federal constitutional rights.

That role is even more narrow where, as here, the petitioner's due process claim does not involve the denial of a specific guarantee of the Bill of Rights but, more generally, the denial of his right to a fundamentally fair trial. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974). For the petitioner to prevail in such a case "[i]t must be established not merely that the [trial court practice or ruling complained of] is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." *Cupp v. Naughten*, 414 U.S. 141, 146, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). In determining whether the petitioner was deprived of a fundamentally fair trial, the "entire proceedings" in the state court must be examined to see whether the alleged error "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643, 94 S.Ct. at 1871.

Due process is a flexible concept. In order to determine whether a criminal defendant has been deprived of a fair trial, and of due process of law, the court must confine itself to the case before it. The narrow inquiry, then, is whether, "under the facts and circumstances of this case the rulings of the trial court deprived [the petitioner] of a fair trial." *Chambers v. Mississippi*, 410 U.S. 284, 303, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973).

In order to establish that any error of the trial court "so infected the trial with unfairness," *Donnelly*, 416 U.S. at 643, 94 S.Ct. at 1871, as to rise to the level of constitutional error, the petitioner must go beyond mere "speculation" and make out a claim of "demonstrable reality." *Beck v. Washington*, 369 U.S. 541, 558, 82 S.Ct. 955, 964, 8 L.Ed.2d 98 (1962), *quoting United States ex rel. Darcy v. Handy*, 351 U.S. 454, 462, 76 S.Ct. 965, 970, 100 L.Ed. 1331 (1956). That is, the petitioner must establish some harm or prejudice resulting from the claimed error. This case does not involve a state court ruling or procedure that can be characterized as "presumptively prejudicial," nor does the petitioner claim that it does. Instead, the parties agree that "the true measure of prejudice in this case must look to any advantage an erroneous ruling gave the State that it would not otherwise have had." Specifically, that "advantage" consisted of the difference between the rebuttal expert testimony of a psychiatrist who testifies in re-

sponse to hypothetical questions and the rebuttal expert testimony of a psychiatrist who testifies on the basis of an examination. This difference is the crux of the petitioner's claim. He concedes that under the extenuating circumstances of Dr. Miller's illness the State would have been entitled to obtain another expert psychiatrist to testify in response to hypothetical questions. He also concedes that a second examination of the petitioner, if conducted pretrial, would not have violated his due process rights. Thus the difference in "credibility" and "effectiveness" of the two types of witnesses, along with the timing of the order, is claimed to amount to an error of constitutional dimensions. Under the circumstances of this case the trial court's decision did not tip the "balance of forces between the accused and his accuser." *Wardius v. Oregon*, 412 U.S. 470, 474, 93 S.Ct. 2208, 2212, 37 L.Ed.2d 82 (1973).

The Magistrate ruled that considerations of fairness in the discovery process and the intrusive nature of psychiatric examinations dictated that a trial court must consider various factors before authorizing an additional examination. The Magistrate criticized the trial court in this case for having considered, in the Magistrate's view, only the "asserted need for the additional examination." He concluded that there was no "compelling reason" to order the examination and that Dr. Miller's illness did not "necessitate" the midtrial examination. Though the trial court's ruling may have been "undesirable, erroneous, or even 'universally condemned.'" *Cupp*, 414 U.S. 146, 94 S.Ct. 400, "not every trial error or infirmity which might call for supervisory powers correspondingly constitutes a 'failure to observe that fundamental fairness essential to the very concept of justice.'" *Donnelly*, 416 U.S. at 642, 94 S.Ct. at 1871, *quoting Lisenba v. California*, 314 U.S. 219, 236, 62 S.Ct. 280, 290, 86 L.Ed. 166 (1941). Thus the mere fact that the procedure followed by the trial court could have, in the Magistrate's view, been improved upon, does not elevate the error to the level of a due process violation.

The petitioner had an opportunity, which he exercised, to cross-examine the state's rebuttal witness. This cross-examination was thorough. Whether the difference between Dr. Alexander's testimony and that of another psychiatrist, who would have testified only in response to hypothetical questions, prejudiced the defendant does not rise above speculation. The state trial court's order, which was precipitated by the unforeseen unavailability of the expert psychiatric witness it had planned to call at trial, was an attempt to provide the State with a "fair opportunity to obtain evidence on the issue" of the defendant's mental state. Whether it was proper or improper, the decision was not so egregious as to deprive the petitioner of a fundamentally fair trial.

Having disposed of the petitioner's due process claim, it is appropriate for the Court to consider the petitioner's self-incrimination claim of error. He argued before the State Supreme Court, the Magistrate and to this Court, that the second compelled psychiatric examination violated his privilege against self-incrimination. The Connecticut Supreme Court and the United States Magistrate have both rejected the petitioner's contention on this issue. The Court adopts the Magistrate's findings that nothing "in the rationale offered by the Supreme Court in *Estelle v. Smith* [451 U.S. 454, 465, 101 S.Ct. 1866, 1874, 68 L.Ed.2d 359 (1981)] ... indicate[s] that when a defendant raises the issue of his mental state at the time of the offense charged, the prosecution becomes entitled to one, but only one, examination."

### Conclusion

For the foregoing reasons, the judgment of the United States Magistrate is reversed and the petition for a writ of habeas corpus is denied.

SO ORDERED.